# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BIOCLIN BV,**

        **Plaintiff,**

v.                                                    **Case No:   6:13-cv-1901-Orl-37DAB**

**MULTIGYN USA, LLC and KARL J. BONGA,**

        **Defendants.**

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion filed herein:

> **MOTION:**    **MOTION FOR DEFAULT JUDGMENT (Doc. No. 35)**
>
> **FILED:**      **August 25, 2014**
>
> **THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

Plaintiff Bioclin BV filed suit on December 12, 2013, alleging Defendants MultiGyn USA, LLC and Karl J. Bonga were in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and the Anticybersquatting Consumer Protection Act, 15 U.S.C §1125(d), the Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fla. Stat. §§ 501.201, and the Florida Communications Fraud Act for misleading advertising, Fla. Stat. § 817.41; and asserting a common law claim for unjust enrichment. Doc. 1.

On March 31, 2014, Plaintiff sought a default judgment against the Defendants, arguing that they were properly served with the summons and complaint. Doc. 25. The Clerk entered defaults against both of these Defendants on February 14, 2014. Docs. 22, 23. However, because there

was no indication that the Defendants were served with the Complaint – as opposed to other motions or exhibits having to do with the Motion for Temporary Injunction – the defaults were vacated and Plaintiff's Motion for Default Judgment was denied without prejudice.  See Docs. 20, 21, 27.  On August 1, 2014, Plaintiff filed Amended Affidavits for Service of Process Nunc Pro Tunc (Docs. 28, 29), and four days later Renewed Motions for Entry of Clerk's Default (Docs. 30, 31) which showed that the process server had originally served both Defendants with the Complaint (though inadvertently omitted it from the affidavit of service); the Motions were granted on August 14, 2014.  Doc. 32.

On August 25, 2014, Plaintiff renewed its Motion for Default Judgment against the two remaining Defendants, MultiGyn USA, LLC and Karl J. Bonga[1], seeking an injunction and damages pursuant to the ACPA, the Lanham Act, the Florida DUTPA, and the Florida Communications Fraud Act.  See Doc. 35 at 7-8.  Although Plaintiff seeks an award of damages, it has provided no argument in the memorandum of law regarding its entitlement to the amount of any statutory damages which should be awarded.  Plaintiff also has not argued in its Memorandum of Law that it has successfully met the elements of any claim except for its claim under the ACPA.

**I. Default Judgment**

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear pursuant to Federal Rule of Civil Procedure 55(b)(2); *DirecTV, Inc. v. Griffin*, 290 F.Supp.2d 1340, 1343 (M.D. Fla. 2003).  In the body of the Motion for Default Judgment, Plaintiff argues the Defendants were in violation of the Lanham Act, the

---

[1] Plaintiff dropped its claims against Joyce Bonga in July 2014.  Doc. 27.

Anticybersquatting Consumer Protection Act, Florida's DUTPA and Communications Fraud Act for misleading advertising, and asserts a claim for unjust enrichment[2].  Doc. 35 at 1-2.

According to the Amended Affidavits of Service of Process, Defendant Karl J. Bonga was served individually and as the registered agent of MultiGyn USA, LLC, with a summons and copy of Plaintiff's Complaint on December 17, 2013.  *See* Docs. 20, 21 (explaining in amendment the oversight in the original affidavits).  However, neither Defendant filed a timely response with this Court after they were served with process, and the Clerk entered defaults against both on August 15, 2014.

The Court finds that Defendants' failure to timely respond to the Complaint and subsequent entry of default against them served to admit the well pleaded allegations of the Complaint, including that Defendants' unauthorized use of an identical copy of Bioclin BV's trademarks was deliberate and violated the ACPA.  *See, e.g., Buchanan v. Bowman*, 820 F.2d 359 (11th Cir. 1987) (in defaulting, defendants "admit the plaintiff's well-pleaded allegations of fact."); *see also Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (citing *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).

   *A.  Anticybersquatting Consumer Protection Act (Count I)*

In 1999, Congress passed the Anticybersquatting Consumer Protection Act ("ACPA" or the "Act") as an amendment to the Lanham Act, a/k/a the Trademark Act of 1946.  Pub.L. No. 106–113, app. I, §§ 3001–3010, 113 Stat. 1501, 1501A–545–52 (Nov. 29, 1999).  The ACPA "protects the owner of a distinctive or famous trademark from another's bad faith intent to profit from the

---

[2] Plaintiff alleges that it stated additional claims in the Complaint (Doc. 35 at 1-2), but the following claims are not alleged in the Complaint and not discussed at all in the Motion for Default Judgment:  violation of Florida's common law trademark law; fraud, trade name infringement, misrepresentations, and breach of contract.  Thus, the Court does not address them.

trademark owner's mark by registering or using a domain name which is identical or confusingly similar to, or dilutive of, the trademark's owner's mark without regard to the goods or services of the parties." 15 U.S.C §1125(d).  The deliberate and unauthorized use of an identical copy of a mark that is distinctive to another's famous or well known mark creates a presumption of confusion among internet users as a matter of law.  *See Victoria's Cyber Secret Limited Partnership v. V Secret Catalogue, Inc.*, 161 F. Supp. 2d, 1339 at 1346 (S.D. Fla. Sept. 10, 2001).  ACPA also recognizes that registering internet domain names that are intentional misspellings of a famous trademark is a violation of the Act. *See id*. (citing *Shields v. Zuccarini*, 254 F.3d 476, 485 (3d Cir. 2001)). The ACPA was passed to prevent the bad faith intent to profit off of the goodwill and reputation of an established business. *See id*. at 1346.

To prevail under the ACPA, a plaintiff must prove that (1) its mark is distinctive or famous and entitled to protection; (2) the defendant's domain name is identical or confusingly similar to the plaintiff's mark; and (3) the defendant registered or used the domain name with a bad faith intent to profit.  *Bavaro Palace, S.A. v. Vacation Tours, Inc.,* 203 Fed. Appx. 252 (11th Cir. 2006) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001))[3].  In determining whether a person has a bad faith intent the court may consider the following:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the [defendant]'s intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or

---

[3]  Plaintiff does not appear to seek default on the other claims alleged in the Complaint.   See Doc. 35.

> disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
> (VI) the [defendant]'s offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the [defendant]'s prior conduct indicating a pattern of such conduct;
> (VII) the [defendant]'s provision of material and misleading false contact information when applying for the registration of the domain name, the [defendant]'s intentional failure to maintain accurate contact information, or the [defendant]'s prior conduct indicating a pattern of such conduct;
> (VIII) the [defendant]'s registration or acquisition of multiple domain names which the [defendant] knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
> (IX) the extent to which the mark incorporated in the [defendant]'s domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.
> \* \* \* \*
> (ii) Bad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

§ 1125(d)(1)(B)(i) and (ii).

   *B. Other claims*

Plaintiff also apparently seeks (in the Conclusion section of the Motion for Default Judgment) unspecified relief pursuant to: the Lanham Act for trademark infringement, counterfeiting, and unfair competition (Count II, III); the Florida Deceptive and Unfair Trade Practices Act (Count IV); Fla. Stat. § 817.41 for misleading advertising, (Count V); and Florida common law for unjust enrichment (Count VI).  However, Plaintiff has failed to argue in the Motion or included Memorandum of Law any grounds for entry of a default judgment on these claims, as required by Rule 3.01(a) which states:   "In a motion or other application for an order, the movant shall include a concise statement of the precise relief requested, a statement of the basis for the request, and a memorandum of legal authority in support the request, all of which the movant shall include in a single document not more than twenty-five pages."   Thus, no additional relief is

appropriate under the claims in the Complaint, except to the extent it is supported as appropriate under the ACPA.

*C. Application*

Because default has been properly entered against Defendants, they are deemed to have admitted the factual allegations made in Plaintiff's Complaint. *See* Doc. 1. BioClin is a Dutch corporation, founded in 1989, which markets a range of feminine hygiene or gynecological products, including products under the name "Multi-Gyn."  The Multi-Gyn brand is the key brand of BioClin and is exported to more than 30 countries around the world where the products are sold through drugstores and pharmacies and recommended by gynecologists.  Doc. 1 ¶ 9. 11. All of the products in the Multi-Gyn range have "Medical Device" registrations.  The products are sometimes prescribed by gynecologists and general medical practitioners, and sometimes purchased and used by women on a "self-care" basis, both externally and internally.  Doc. 1 ¶ 11.  In many of those countries, Multi-Gyn is the market leader in gynecology and intimate care and in some countries, such as the United Kingdom, the products are reimbursed by the health insurance.  Doc. 1 ¶ 9. These products are also sold over the Internet, exclusively by BioClin and authorized distributors. Doc. 1 ¶ 9.  Full information on the products is provided for consumers and healthcare professionals on BioClin's website, and many of BioClin's distributors operate similar websites in their local languages, so that consumers have ready access to relevant information.  Doc. 1 ¶ 12.

BioClin holds Benelux, European Union, and international registrations of the trademark "MULTI-GYN". The Benelux registration dates from December 21, 1995, and the Community Trademark from March 15, 2005.  Doc. 1, Ex. A & B. These registrations cover a variety of products in international classes 3 and 5, including as cosmetics, pharmaceutical and medicinal preparations, also for the treatment of gynecological disorders; homeopathic and phytotherapeutic medicines; hygienic and disinfecting; materials for dressings.  The international registration covers

the same products, and was registered on September 11, 2009 for two designated countries, Australia and the United States. *See* Doc. 1, Ex. A. BioClin has registered a figurative Community Trademark, which looks like the outline of a stylized female form; the mark ("the figurative mark") has been registered since 2002. Doc. 1, Ex. B. BioClin also holds a number of "Multi-Gyn" domain names, which it registered for its authorized distributors to translate product information into their native language. Doc. 1, Ex. C. BioClin took reasonable measures to maintain the propriety of its trade name and trademarked products, which included requiring distributors to sign non-disclosure agreements and safeguarding the proprietary formulation by not disclosing it. Doc. 1 ¶ 16.

The spouse of Defendant Karl J. Bonga, Joyce Bonga[4], had used Plaintiff's products, buying them via Plaintiff's website. Doc. ¶ 17. Joyce Bonga subsequently entered into confidentiality and distribution agreements with Plaintiff in the second half of 2001 to sell Plaintiff's products in the United States; as part of the agreements, Joyce Bonga agreed not to divulge confidential information to others, including to her husband Karl Bonga. Doc. 1 ¶ 18 & Ex. D, E. Eventually, on May 3, 2004, BioClin formally terminated its agreements with Joyce Bonga based in part on her failure to order the agreed minimum and failure to meet sales goals. Doc. 1 ¶ 24.

Karl Bonga stole Plaintiff's proprietary formula and other trade secrets and conveyed this information to a local manufacturing firm to make his own counterfeit version of Multi-Gyn; Karl Bonga also used the identical figurative mark used by Plaintiff. Doc. 1. ¶¶ 30, 31. BioClin has a proprietary interest in: 1) the trade name "Multi-Gyn"; 2) the stylized female form ("figurative mark"); and 3) the BioClin formulation; however, substantial elements of Defendants' product packaging are identical to the packaging of Plaintiffs products, intending to profit off of these

---

[4] Apparently, the two Bongas began to live separately in 2006. Doc. 1 ¶ 21.

proprietary items.  Doc. 1, Ex. I.  In particular, both product packs have the expression "Multi-Gyn" (or in the case of the Defendant's product, "MultiGyn") written in white lettering against a black rectangle background, with the rectangle and the written expression rotated 90° to the left; the figurative mark appears immediately to the right of the black rectangle, with the right hand side of the black rectangle merged into the left hand side of the figurative mark, and both product packs have at the bottom: "For the relief of vaginal discomforts"; the product information on the packaging of the counterfeit products is an almost identical copy of the original products of BioClin, and Defendants use Multigyn and Multi-Gyn interchangeably.  Doc. 1, Ex. I.

Karl Bonga registered the domain name "www.multigyn.com" on or around February 22, 2002, and began selling products labeled and marketed as "Multi-Gyn" and "MultiGyn" products with the intent to deceive Plaintiff's target customers. Doc. 1 ¶ 22.  Defendants intended to profit from BioClin patents, its marketing information, clinical research, trade names and trademarks and deceive unknowing customers by these deceptive and unfair practices. Doc. 1 ¶ 22. Defendants deliberately and falsely represented, and continue to represent, that the products they are distributing to the public are BioClin products.   Doc. 1. ¶ 23. Defendants have falsely claimed that the products marketed on their website are manufactured by BioClin and/or contain the same ingredients as BioClin's products; they also use the same identical packaging design and figurative mark as Plaintiff's products.  Doc. 1. ¶¶ 28, 32.   Because of the confusion between Defendants' counterfeit products, which are not registered with the FDA, and Plaintiff's original products, Plaintiff cannot complete the registration of its products with the FDA and cannot enter the United States market.

Long prior to the time of the Agreement, the name "Multi-Gyn" was inherently distinctive, and had become further distinctive by acquiring secondary meaning, as it is very conspicuous, distinctive and individual consumers have been confused upon the introduction of the "MultiGyn"

- 8 -

products to the internet. Doc. 1 ¶ 34. On October 7, 2011, Karl J. Bonga formed a Florida limited liability company called "MultiGyn USA, LLC." Doc. 1 ¶ 35; Ex. K.

Karl Bonga and MultiGyn USA's intention was to steal Multi-Gyn's trade name, product formulation, goodwill and reputation and to confuse Multi-Gyn past, present and potential customers, and the general public. Doc. 1. ¶ 38. Defendants' use of the Multi-Gyn name presents an obvious likelihood of confusion. Doc. 1. ¶ 38. Defendants adopted www.multigyn.com ("the Infringing Domain Name") with a bad faith intent to profit from the marks of Plaintiff and they subsequently registered the Infringing Domain Name in bad faith. Doc. 1. ¶ 46. Defendants, without authorization, deliberately and intentionally misappropriated an exact copy the Plaintiff's distinct figurative mark of a female form, claimed to be the exact product Plaintiff produced and distributed, and even took on the same history of the origin of the Plaintiff. This was done specifically to use the good name and history of the Plaintiff with a bad faith intent to profit and to cause confusion to the purchasing public. Doc. 1 ¶ 46. The Plaintiff's figurative mark is distinctive; the mark is a stylized female form. See Doc. 1, Ex. B.

"Distinctiveness refers to inherent qualities of a mark and is a completely different from fame. A mark may be distinctive before it has been used – when its fame is nonexistent." *See Sporty's Farm, LLC v. Sportman's Mkt., Inc.*, 202 F.2d 489 (2nd Cir. 2000). Plaintiff has used the figurative mark of the stylized female form for a significant period of time and well before the Defendants' use of the identical form; BioClin registered the figurative Community Trademark in 2002. Doc. 1, Ex. B.

Defendants had no relationship with the Plaintiff at the time they registered the Infringing Domain Name and had no valid trademark rights to use the distinct figurative mark. *See Victoria's Cyber Secret Limited*, 161 F. Supp. 2d, 1347 (S.D. Fla. Sept. 10, 2001). Defendants chose a domain name that is virtually identical to that of the Plaintiff's website, with the exception of a small hyphen.

Defendants' website is confusingly similar to that of Plaintiff's and, as alleged in the Complaint and Exhibits attached thereto, it has already caused confusion among the public. Doc. 1, Ex. G (Declaration of Susan Middleton). The addition of the 'hyphen' between the words "Multi" and "Gyn", and the interchangeable use in the Defendants' website of the name, coupled with the identical mark of the female form used by Plaintiff (*see* Doc. 1, Ex. I), creates a presumption of being "confusingly similar" among internet users as a matter of law. *See id.* at 1351 (citing *People for the Ethical Treatment of Animals, Inc., v. Doughney*, 113 F.Supp.2d 915, 920(E.D.Va.2000)).

The facts of this case are similar to those in *Agri-Supply Company, Inc. v. Agrisupply.Com*, 457 F.Supp.2d 660, 662 (E.D.Va. 2006), in which the court found a violation of the ACPA where a repeated cybersquatter owned the domain "Agrisupply.com" that was confusingly similar to plaintiff's domain name "Agri-Supply.com" used for the Agri-Supply trademark. The district court noted that the two domain names were "virtually identical" to Plaintiff's trademark, and plaintiff's allegation in the complaint that the domain name was "confusingly similar" was well-founded. *Id.* at 662-63. In this case, Defendants' use of "Multi" and "Gyn" on the website and the mark of the distinctive female form identical to Plaintiff's are confusingly similar and, thus, violate the ACPA.

### II. Injunctive Relief

Plaintiff is entitled to injunctive relief to prevent any future infringement or "cybersquatting" of its marks. The ACPA[5] permits the issuance of a permanent injunction to prevent future violations. 15 U.S.C. § 1116(a). Although the Act also provides for the recovery of actual damages or statutory damages between $1,000 and $100,000 per domain name in lieu of actual damages, *see* 15 U.S.C. § 1117(a) & (d), Plaintiff has not provided any argument or evidence in support of a

---

[5] The ACPA applies to "all domain names registered before, on, or after the date of the enactment" of the ACPA, November 29, 1999.

statutory award. Instead, Plaintiff seeks to have the Court reserve jurisdiction to award statutory damages[6] for cybersquatting at an unspecified later date. Doc. 35 at 8.

Plaintiff has established the necessary elements for a permanent injunction in its Complaint. The Eleventh Circuit has noted that trademark infringement by its nature often results in irreparable harm and that there is generally no adequate remedy at law. *Tally-Ho, Inc. v. Coast Comm. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989). The same rationale would apply to irreparable harm caused by trademark infringement in the internet context by cybersquatting. *See, e.g., Victoria's Cyber Secret Limited Ptr. v. Secret Catalogue, Inc.,* 161 F. Supp. 2d, 1347 (S.D. Fla. 2001).

The irreparable injury in this case is similar to that discussed in other ACPA's cases describing how the content of a defendant's website threatens injury to the plaintiff. *See, e.g., Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (stating that without an injunction "Audi would be irreparably harmed by consumers on [defendant]'s site purchasing counterfeit items, instead of those that were lawfully sold by Audi"); *Coca–Cola Co. v. Purdy*, 382 F.3d 774, 789 (8th Cir. 2004) (affirming that plaintiffs would be irreparably harmed by defendant's continued use of confusingly similar domain names to display pictures of dismembered aborted fetuses and by the links to fundraising appeals that did not originate from the plaintiffs); *Shields v. Zuccarini*, 254 F.3d 476, 486 (3d Cir. 2001) (finding a likelihood of confusion threatened irreparable injury because "[plaintiff] does not want his audience trapped in [Defendant]'s sites" by defendant's practice of "mousetrapping"—the trapping of Internet users in a succession of pop-up advertisements).

In this case, as Plaintiff points out, the public is likely to assume that Defendants' website is associated with Plaintiff's. Defendants have chosen a domain name that is virtually the same as

---

[6] Plaintiff also requests that the Court retain jurisdiction to award punitive damages; however, punitive damages are not available under the Lanham Act and the ACPA. *See Victoria's Cyber Secret*, 161 F. Supp. 2d 1339 (S.D.Fla. 2001) (citing *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103 (2nd Cir. 1988)).

Plaintiff's website, identical with the exception of a small hyphen. Defendants' website is confusingly similar to that of the Plaintiff's and, as alleged in the Complaint and Exhibits attached thereto, it has already caused confusion amongst the public. Doc. 1, Ex. G. The addition of the 'hyphen' between the words "Multi" and "Gyn", and the interchangeable use in the Defendants' website of the name, coupled with the identical mark of the female form used by Plaintiff, creates a presumption of confusion among internet users as a matter of law. *See id.* at 1351 (citing *People for the Ethical Treatment of Animals, Inc., v. Doughney*, 113 F.Supp.2d 915, 920(E.D.Va.2000)).

As Plaintiff points out, Defendants had no relationship with the Plaintiff at the time they registered the Infringing Domain Name and had no valid trademark rights to use the distinct figurative mark, and their conduct demonstrates a substantial likelihood that they will continue to act as they have previously done in the future—using the Plaintiff's mark, profiting off the infringing website, selling counterfeit products to internet consumers, and profiting off the good name and history of the Plaintiff's company. In addition, Defendants have not taken any steps to remedy the use and products it has marketed as Plaintiff's products despite demand letters (*see* Doc. 1, Ex. J) and the instant lawsuit, to which Defendants have defaulted. *See Federal Election Commission v. Odzer*, 2006 WL 898049, at *5 (E.D.NY. April 3, 2006) (failure to participate in litigation is an indication that an injunction is necessary to ensure the [defendants] do not continue to violate). The balance of hardships and the public interest also favor a permanent injunction. A permanent injunction prohibiting the use of Plaintiff's marks in connection with Defendants' business will not harm Defendants, and the public will benefit by eliminating any confusion about Defendants' sale of products which are counterfeits of Plaintiff's.

## CONCLUSION

It is respectfully **RECOMMENDED** that that Default Final Judgment against Defendants MultiGyn USA, LLC and Karl J. Bonga be entered permanently enjoining Defendants, their officers,

directors, members, shareholders, agents, servants, employees, subsidiaries, affiliates, successors, assigns, attorneys, representatives, any entities owned or controlled by any of them, all of those in active concert or participation with any of them, and each of them who receives notice directly or otherwise from:

a) continuing to engage in any conduct that violates the Anticybersquatting Consumer Protection Act;

b) continuing to misrepresent to the purchasing public that MultiGyn is in any way affiliated or the same product as BioClin/Multi-Gyn;

c) continuing to deceive the purchasing public that its products purport to be those tested and developed by BioClin and enjoy in the longstanding reputation of BioClin's Multi-Gyn product line;

Further, Defendants are to destroy any printed advertising material and products using the Multi-Gyn mark, logo, "www.multigyn.com" or any of the domains registered to Plaintiff, or any similar sounding or looking domain names, or any other name containing the marks or any derivative thereof. Also Defendants must cease all sales of the offending products, and cease use of the domain name "www.multigyn.com" and any internet sales website; and assign and/or transfer the rights in the Infringing Domain Name to BioClin within 14 days from any order adopting this Report and Recommendation.

To the extent Plaintiff seeks to have the Court reserve jurisdiction to award of statutory damages under the ACPA for cybersquatting, it is respectfully **RECOMMENDED** that such relief be **DENIED** without prejudice for Plaintiff's failure to support the request with any argument or authority on its entitlement to such relief.  To the extent Plaintiff seeks to have the Court reserve jurisdiction to award exemplary and punitive damages, it is respectfully **RECOMMENDED** that such relief be **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on November 25, 2014.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties